Please call the next case. Good morning, your honors. My name is Francisco Porter and I represent the Plaintiff Appellant David Adcock. Mr. Adcock worked as a welder for the Employer Connect Manufacturing when he injured himself on May 10, 2010. It was an injury to his left knee and the medical notes will reflect that he turned to his right to weld when he felt a pop in his left knee. These facts are not in dispute to the best of my knowledge. I think the issue here and what I would like to focus on is the decision by the commission reversing the arbitrator and then by the circuit court that this injury did not arise out of my client's employment. I would like to point out that he worked sitting down in a swivel chair as a welder because of a previous workers' compensation injury. So all the other welders actually stood and welded as they stood. My client sat down on a swivel chair to weld. I also could not help but notice that your honors are also sitting in swivel chairs today. And it occurred to me that as an example, if you were to reach for a glass of water, that would not be incidental to your job. But if the clerk hands you a file and you turn in your chair to your left, to your right, and you suffer an injury to your back or your knee, that turning to grab a file from the clerk would be incidental to your job. Likewise, in the case of Mr. Atcock, I almost forgot my client's name, in the case of Mr. Atcock, he was turning to weld. And there is no dispute about that, is there? There is no dispute. No dispute, your honor. Then it becomes some, in my opinion, some nonsense about whether he had any tools with him and whether there was a mask. And obviously, I'm not an expert in welding, but I think I know enough to know. There wasn't even any testimony about any of that, was there, whether he had a mask on and all that? I mean, but he said... He said turn to weld. Yeah. When I swiveled my knee, let's see. Let me back up. He says, like I said, the lock system has a Part A and a Part B. When I welded up or tacked up Part A, which is here, I moved to Part B to set it in and make sure everything is aligned. And once I did that, when I went back to weld Part A, I swiveled in like so to weld it, and when I swiveled my knee, it rotated my knee in, and I felt a pop. I mean, there's no dispute. Nobody else witnessed it and said, no, that's not what happened. Right. So there's no dispute that he was welding. The question is the turning on the chair, the turning of his body on the swivel chair to weld, did that arise out of the employment? I think that's really the question, and that's what I would like to focus... Well, doesn't it boil down to whether he was, as we've said many times in cases, performing acts which he was instructed to perform by his employer, acts which he had a common law or statutory duty to perform, or acts which the employee might reasonably be expected to perform? He was doing his job, wasn't he? He was doing his job. He was doing all of that. Was it disputed that he wasn't in the course of his employment? I don't think they're not disputing that he was welding. Well, that's being in the course of your employment. Right. Now we're talking about whether or not the condition of ill-being that he experienced in the course of his causation, did it arise out of it? Right. Well, I think then we turn to two issues. So we've got Dr. Wolin here. We have Dr. Wolin and Dr. Rochelle. Okay. And so as far as Dr. Wolin, and I think this is important. It is important, first of all, I'd like to point out two things concerning these two doctors, or perhaps more than two. Here's the first issue. The first issue is whether or not Mike Bryant had a previous existing condition, because they rely on Board of Trustees, and we all know that Board of Trustees, I think the example was that in Board of Trustees there was somebody turning, also on the chair, turned, but he had a preexisting condition. And also he was not turning to do anything connected to his job in Board of Trustees. Right now isn't this really a question of did this activity create a condition or aggravate a condition? Okay. So addressing the issue of whether there was a preexisting condition, because that's important. No. And is it? Because did the commission make a finding relative to that aspect? Did it agree with Dr. Wolin in any way? Or did it just simply confine its analysis to whether or not this was an injury caused by an increased risk, the neutral risk analysis that the commission engaged in? Because I'm frankly, looking through the commission's decision, I didn't see anything in there about Dr. Wolin. Yeah. Tying into Dr. Wolin's and buying into that argument. Yeah. As a matter of fact, the commission's decision states the evidence establishes the petitioner did sustain a left knee injury. Right. In other words, they found that he sustained the injury in that location at that time. Exactly. And I was referring to the Board of Trustees because at the Circuit Court there's some mentioning of Dr. Wolin, some reliance on Dr. Wolin's opinion. But I do think that, again, just to finish my point, my client during Dr. Rochelle's deposition, I specifically asked Dr. Rochelle, would you have been able to tell when you went in and performed surgery to the left knee, would you be able to tell if there was a previous injury to that knee? He answered yes, I would have been able to tell. Did you find any evidence when you performed surgery to the left knee that there was a previous injury to that knee? And the answer was no. Dr. Rochelle said no. And to tie it up, Dr. Wolin did say, in reference to an MRI, not in reference to the specific issue, he did say that the operating surgeon looking at the actual pathology, the actual knee, during surgery, is in a better position to render an opinion than just somebody looking at an MRI. And, again, the only mention that there's a preexisting condition comes from the IME report where Dr. Wolin says that my client told him that there was a prior injury to the left knee. That's the only mentioning of a preexisting condition, which obviously we say is just not comparable to Dr. Rochelle's statement that he operated on the knee and did not find any evidence that there was a preexisting condition. Now, a lot of weight is given to what Dr. Rochelle allegedly opines in regard to the risk that my client was exposed to at work and whether or not this injury could have occurred at work or any other place. I'd like to point out, Your Honors, that Dr. Rochelle's opinion, what he testified to, was that his patient history was consistent and described an appropriate mechanism of a meniscal tear. That's what he opined. Then he answered hypothetical questions. And from those hypothetical questions, which is could the injury have occurred stepping out of the car, could the injury have occurred anywhere? He has said the injury could have occurred anywhere. It could have occurred when he stepped out of the car. It could have occurred in many other places. But that's an answer to an hypothetical question because you can pose the same hypothetical question. If a plumber, working, bends over to look under the sink, injures his back, and Dr. Rochelle, could the plumber at home bend down to tie his shoes, could that injury occur at home when he's tying his shoes? What is Dr. Rochelle going to answer? I would certainly say that the answer is yes, he could have. If a plumber, I'm sorry, if a carpenter hammers a nail and bangs his finger, could he be doing homework repairs and bang his finger at home? Of course he could. If somebody lifts a box at work, can you injure yourself lifting your 4-year-old at home? Of course. Of course. Those are hypothetical questions that the answers are obvious to everyone. But if that's the standard, if that's what you are going to follow, then any injury at work, bending, stooping, squatting, lifting, any injury can occur at some other place. That is not the test. That is not the test and should not be the question. The question is, of course, whether the measuring stick is whether there's a risk of injury at work greater than to the general public. That's really what the question should be. Do we even have to get to that if the risk is distinctly associated with his employment? I mean, if his job requires him to turn in the chair to weld, why do we even compare it to the general public? He's doing his job. Because I think that what the commission did and what the circuit court followed was to look at the positional risk injury. They just basically said all he did was to turn on the chair. That's really what they're using. I mean, they are just separating the two. I think that's the reason why they... Is that the right analysis? That's my interpretation of what they did. I understand that's what they did, but is that the right analysis? No. Okay. That's not the right analysis. What's the right analysis? Well, the right analysis is, of course, that he was welding and he was performing his duties within the scope of his employment. He was doing what he was expected to do in his job. The employer expected him to perform that job and provided him with a chair to perform the job within the scope of his restrictions. So that's still back into the course. Right, right. Okay. So, I mean, the employer also requires people maybe to go from Station A to Station B and to walk. Okay? So he's in the course. But the reason there's positional risk is, does it arise out of it? Okay? And isn't that why that analysis is coming about? What? It's not just enough that he suffered an injury while he was at work. Okay, correct. But he is not just at work. He is performing his job. He's turning to weld. Okay? He's turning to weld and that action is part of his job. Turning is something we all do every day of our lives. We do it at work. We do it not at work. Yes. Is there some unique risk there that the general public doesn't have when he's on the factory floor? Well, the unique risks to his job, obviously, what we try to point out in our briefs, is that, number one, the general public is not wearing masks and carrying torches and is not moving from left to right and turning to weld big heavy lockers. So the general public is not exposed to that risk. The general public is not exposed to quotas and time constraints. And counsel is going to say, well, we introduced evidence that those time constraints, that he was a terrible worker, that he did not perform up to par. It's irrelevant. Irrelevant if he was the best employee or the worst employee. The question is, did he have time constraints? And the time constraints were there and the quotas were there and he was required. It seems like, you know, your better argument is what Justice Stewart was talking about earlier. It's the Board of Trustees case. It's Young, which came out after the parties briefed this case, but it's where it's a risk that's distinct to the employment. It may be something that the general public does, and Young, it was a matter of this fellow reaching into a box. You're familiar with that case? Which case? I'm sorry, Your Honor. Young, that came out earlier this year? I mean, well, that's a case that, you know, would support your client's position in here, reaching into a box that was three feet deep and pulling a part out or putting a part in, I think it was. But in any event, a task or a movement that the general public would engage in, the reaching aspect. But it was something that he did as a regular part of his job. It was a risk distinct to his employment, just as in Board of Trustees, and that it wasn't a heightened risk, something that the public wouldn't have been exposed to. I mean, isn't that what you're arguing here or what your argument should be here? Well, it is what I've been trying to communicate. Of course, I've tried to address other issues that have been argued in the brief and that I thought were important. But, yes, I mean, obviously, Justice Stewart and you have made my point in many different ways. And it's certainly my argument that you are correct and that that case that I'm not familiar with, I apologize, but I'm not familiar with that case. Well, and then in follow-up to that, there then comes a, as with anything in the law, the continuum of that rationale or that notion that it may be a movement that the public commonly does, but in this case it's something that is distinct to the fellow's employment. Your example at the outset of argument where you indicated Justice Holdridge were to reach, swivel in his chair and reach for a glass of water, is that compensable if he's injured in that? Whereas if he swivels and accepts a court file from the clerk, that might be. Well, you're really starting to get into a continuum here where do you draw that line as to the movement being distinct to employment? But, you know, are we there at that point here with this fellow or not? That I don't know. I mean, what we held in Young is that if he's performing an act that he was instructed to perform by his employer or is incident to his employment here, he was a welder, he was reaching or turning to weld, then that act is a part of his employment. And you don't do a neutral risk analysis. You don't even get there. That's what we held in Young. That's what you want to say here, isn't it? It doesn't matter if people turn every day. He turned to weld. Yeah, and I think we argued that throughout our briefs, that that was our point, obviously, is that our client was working and he turned not just to do, you know, just not to do anything, but he turned to weld, to do his job exactly what he was expected to do by the employer. And what if he's expected by the employer to take an envelope from station A to station B? I'm sorry? And walk. Walk. Take an envelope, walk over from station A where the envelope is on the desk and to put it at station B on that desk. Um, well, I think there's cases that say that if you have to do it with a certain frequency, then, you know, it's not, it's going to be, it's not a risk that the public is exposed to if you have to do it. Okay, so we get into a greater frequency analysis. Right. Yeah, your time is up. You'll have time on the clock. Okay, thank you. Thank you. Mr. Broderick. Sir. Can I give my opponent the benefit of the young case? Thank you. Okay with us. May it please the appellate court, Mr. Botto, my name is Ralph Berkey. I'm standing in for the attorney who tried the case and wrote the brief. I represent CONAC, the employer, and the appellee. The question that came out of my opponent's oral argument was, what is the right analysis? The right analysis has been determined. It is did the employment increase the risk of harm to which? So in every case you do a neutral risk analysis. Is that what you're saying? I'm saying that. Because most injuries occur from some kind of turning, bending, stooping, reaching, whatever. So in every case we say, well, the general public reaches, the general public turns. Does it matter if you're reaching or turning or whatever to do the job you're assigned to do? Doing the job you're assigned to do can involve many actions. Some of which are purely employment related. And some of which are not. It isn't that the employee shows up at work and suddenly becomes only subject to employment risks.  There are employment risks. The risk of an explosion in the paint factory. There are purely personal risks. The risk of someone coming into that plant and shooting him because he has a Super Bowl bet dispute with his killer. And then there are the so-called neutral risks where an analysis must be performed. If we can determine whether or not the employment took a neutral risk and increased that risk. That is the analysis that must go on. And the young case that you referred to talks about increasing the risk. The young employer, that's capital Y, young employer. I don't know what his actual age was. The employee in the young case had to encounter an unnatural condition. Reaching into a goofy box. The employee in University of Illinois trustees was in a swivel chair and turned and achieved an unnatural position. His employment forced him into a position that increased the risk. Well, I don't know that young actually employed that reasoning that it was an unnatural position. I think the young analysis was the claimant performed an act that the general public might perform. But here what made it compensable was it was an act that was distinct to his employment. His employer required that he reach into that box and do what he did. Even though the general public might also reach into boxes in their everyday lives as well. So it wasn't the qualitative difference in how he was doing it or the number of times he was doing it. It was just whether or not that task was required of his employment. In fact, Young specifically says if this task is required of his employment, you do not do a neutral risk analysis. I respectfully disagree with the logic in Young in that it did not adhere to the increased risk doctrine. Young got to the right result. I'm just getting there by a different path. There is no doubt that Young had to achieve a, if you'll forgive the word, the adjective, a goofy position. A three-foot deep box. And does it have to be a goofy position if he... It has to be something... So if it would have been a two-foot box, he shouldn't have recovered. Even though his job was to reach in that box and pull out, I think it was a 15 or 20-pound part. The action that the Young defendant or the Young employee was required to do was unnatural and not that exposed to the general public. I get to the result in Young on the increased risk theory. I must apologize to the Court if I'm... No, but what you're saying is, whereas you say Young may have achieved the right result, but the analysis in Young was an analysis that takes us into positional risk. That's exactly what I'm saying, Your Honor. Whereas the analysis prior to Young was avoiding that. Right, since Illinois has never adopted positional risk. And if I can digress for a moment on Young, Young actually looks at the state of mind of the employer doing a job that the employer could foresee, taking an action the employer could foresee. And I... Honestly, counsel, I don't know where you get that. The Supreme Court and the appellate court in case after case has said that... Let me find it here. I think the wording is expected to perform. Performing acts which he was instructed to perform by his employer, acts which he had a common law or statutory duty to perform, or acts which the employee might reasonably be expected to perform incident to his assigned duties. He's a welder. He was welding. He was not welding at the time of the accident. He was positioning himself to begin welding. Isn't that something the employer told him to do? Go weld and position yourself to weld? Yes. But that does not automatically mean that he engaged in a motion that the employment increased the risk of harm. Well, see, we still have... I think all of us struggle with this as law evolves and goes on. In the course of is all you need in a positional risk state. There's no doubt that this man was in the course of his employment. Right. But, I mean, when we're talking expected to perform or performed as part of the judgment, isn't that in the course of analysis? I mean... Right. But we require a rising out of additionally. And that's why I'm saying a rising out of looks to risk. And the commission found, after looking at all the evidence, that there was no increased risk in the simple motion. I believe that if the clerk over there walked up to hand you a piece of paper and you turned four degrees in your chair and extended your arm and your shoulder went out, that is not a compensable case. If you had to stoop over suddenly because she dropped the file that she was bringing you and you bent over unnaturally, that would be a compensable case. We are talking here about... Well, it may or may not be, but it's closer. All right. Maybe I should have come up with a better example. No. But there is some line... There's a continuum, as Justice Harris has said. There is some line where the employment adds to a risk on one side and it doesn't add on the other. That dividing line is what we're talking about today. The workers' compensation commission looked at the evidence and determined that the action that the employee was engaged in, the risk of harm from that action was not increased by the employment. Just as an aside, did the commission make a determination that there was no causation based on Dr. Wallen's testimony? I must admit, Your Honor, I cannot tell you that. I didn't have the advantage of trying the case, and I was concentrating on the arising out of. I'll have to defer to my opponent who may be able to help us on that. I'm going to try this one more time. Okay. I think I'm going to disagree with you. Here's a quote from Caterpillar Tractor. Okay. A risk is incidental to the employment where it belongs to or is connected with what an employee has to do in fulfilling his duties. Didn't he have to turn in the chair to fulfill his duties? Yes. So why is this not a risk incidental to the employment? It doesn't reach incidental until it overcomes the neutral risk. Illinois courts establish three categories of risk. Risk distinctly associated with employment. Right. Incidental to the employment. The explosion at the paint factory. Well, I'm going to, but that's the Caterpillar definition. Okay. Or idiopathic risk personal or neutral risk. You only do the neutral risk analysis if you find it's a neutral risk. But if it's a risk incidental to the employment, belongs to or is connected with what an employee has to do in fulfilling his duties, it's compensable. That describes positional risk. The reason there is the neutral risk analysis is to avoid adopting the doctrine of positional risk. Everything – I respectfully disagree. Okay. We are met today to discuss how the employment increases risks. We know that the employment must have something to do with the injury. And the definition is, did the employment either have an inherent risk or did they add to a neutral risk? I suppose it's time to get to standard of review. We have a question of fact before us. Whether or not the employment increased the risk of harm. The Workers' Compensation Commission viewed the evidence, weighed the evidence, and that is what is before you today. You have a manifest weight standard of review. Here, the employment provided nothing more than the location for the accident to occur and the occasion for it to occur. The employment, according to the Workers' Compensation Commission in the exercise of its fact finding, the employment did not add anything to the risk of harm to which the employee was exposed. Thank you. Thank you, Counsel. Counsel, you may reply. And I'm not sure if I'm going to add much to what has been said, but I'm listening to Counsel and my fear as we move forward. And Your Honor said that the law evolves. And, of course, that is absolutely true. And the question is, where is it evolving with these cases? Because if, in fact, we accept Counsel's logic and you start separating these actions, the bending over or the turning, and you say that's an element of everyday life and the employer did not increase the risk of you bending over or lifting a hammer or whatever the situation may be, then truly you're going to nitpick every single workers' compensation case. And every single workers' compensation case, there's going to be a good argument for you to say he was just bending over. He can do that at home. He can do that at any point in time. And we do not increase that risk. We do not increase the risk of you turning or lifting that box. And then where do we stop? I can tell you where the evolution goes. The evolution goes to positional risk, and then it goes to there's no more argument. It's a very simple analysis. Anybody can do it. You don't have to be a lawyer. A business agent will do it. That's where you evolve to. Well, hopefully not, but that's an editorial on my part. So, and just one more point that I would like to make about he was not actually welding. He was on the way to welding. So does that mean that, you know, the carpenter who lifts the hammer, well, that doesn't count. If the injury occurs when he lifts the hammer, that doesn't count, because only when he hammers the nail is that when the injury can occur. The injury cannot occur when he lifts the hammer. Because he was on the way to welding. The injury cannot occur right then and there. Only when he's welding. That's the logic that Responding is presenting. I think, obviously, that that's the erroneous logic. The injury can occur when the carpenter lifts the hammer, and the injury can occur when the person is turning to weld, and there's a risk that is increased by the function or the requirements. Okay, so you are accepting increased risk. I'm sorry? You said there's an increase. Well, I do believe that my client's profession as a welder, that there's an increased risk in his profession as a welder as compared to myself or you or any other person, certainly a welder who is welding and there are sparks coming out of whatever he's welding, he's at an increased risk. I'm just saying that he is. Now we're in fact determination. Who's to make that fact determination? I'm sorry, Your Honor? Well, now it's a fact. Who's making that determination as to whether there's an increased risk? I believe there was an increased risk. Well, yeah, but who is? For the reasons. Yeah, but if our beliefs were the determiner, things would be different in the world. But there are facts to be found, and who finds those facts in this system? In this system? Well, ultimately you, the courts. No, no, no, we don't. We've discussed that a lot this week. No, the commission does. Well, but the commission in this case, you know, the commission in this case really relied on Board of Trustees and on some, in our opinion, obviously, interpreted the facts. Like I say, when they rely on Board of Trustees, they are relying on the wrong case because the facts are distinguishable from the facts in our case. My time is up. Okay. Well, no, you have another minute, but you can go ahead. I don't want to shock you, Your Honor. That's okay. I think I've said what I have to say. Okay. Very good. Thank you, Your Honor. Thank you both, counsel, for your arguments in this matter this morning. We'll take them under advisement in a written disposition, shall we?